John L. GORTON , Thomas Hauch, Timothy Hauch and Michael Vander Leest, partners under the name Gorton Farms, a Wisconsin general partnership, Plaintiffs-Respondents,

v.

AMERICAN CYANAMID COMPANY, a Maine corporation, Defendant-Appellant.

Supreme Court

*Nos. 93–0778, 93–2267. Oral argument April 4, 1995.—Decided June 26, 1995.*

(Also reported in 533 N.W.2d 746.)

203

205

For the defendant-appellant there were briefs by *Kenneth B. Ness, John M. Filachek* and *Ness & Foley,* Milwaukee and *Lawrence S. Ebner* and *McKenna & Cuneo,* Washington, D.C. and oral argument by *Kenneth B. Nass* and *Lawrence S. Ebner.*

For the plaintiffs-respondents there was a brief by *Robert H. Bichler, JoAnne M. Breese-Jaeck* and *Hostak, Henzl & Bichler, S.C.,* Racine and oral argument by *Robert H. Bichler.*

WILCOX, J. This case is on certification from the court of appeals following a jury trial held in the circuit court for Racine County, Honorable Dennis J. Barry, Judge. The jury concluded that Gorton Farms Inc. was entitled to damages for harm to its corn crops caused

through the negligence of American Cyanamid Company (American Cyanamid). The issue certified for our consideration is as follows:

> Whether, in light of *Cipollone v. Liggett Group, Inc.,* 505 U.S. —, 112 S. Ct. 2608 (1992), the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. sec. 136v(b), preempts Wisconsin common law damage claims of breach of warranty, failure to warn and misrepresentation brought against a chemical manufacturer of a herbicide registered with the Environmental Protection Agency (EPA)?

In resolving this issue, we also consider a separate issue of whether attorney fees granted to Gorton Farms by the circuit court pursuant to sec. 100.18, STATS., were appropriate. We conclude that the circuit court properly determined that Gorton Farms' claim as to negligent misrepresentation is not preempted by FIFRA and that Gorton Farms is entitled to attorney fees pursuant to sec. 100.18. Therefore, we affirm the decision of the circuit court.

During the 1980's, American Cyanamid developed an herbicide known as SCEPTER.[1] The herbicide is designed to control weeds in soybean crops. SCEPTER was first sold for use in Wisconsin in 1987. SCEPTER has been marketed through American Cyanamid sales personnel and technical representatives, and is sold by agricultural dealers chosen by American Cyanamid.

---

[1] Herbicides fall within FIFRA's definition of "pesticide" and, therefore, are within the purview of the federal statute. See 7 U.S.C. sec. 136(u) (1988). Accordingly, any reference to pesticide in this opinion will necessarily include an herbicide such as SCEPTER.

In May of 1987 and 1988, Gorton Farms bought SCEPTER for their soybean fields. Gorton Farms purchased SCEPTER from the Delong Company, an authorized American Cyanamid agricultural dealer. SCEPTER was preplant incorporated on several fields by Gorton Farms in both 1987 and 1988. There is no dispute that the herbicide provided excellent weed control for the soybean plants.

In the spring of 1988, Gorton Farms planted field corn as a follow crop to the soybeans. Thus, the corn was planted into fields that had eleven months earlier been sprayed with SCEPTER. In June, 1988, there was evidence that the field corn was not growing properly. Gorton Farms asked Ronald Doersch of the University of Wisconsin Agronomy Department to examine the fields. Doersch indicated that the corn could have been adversely affected by the previous application of SCEPTER.

On February 9, 1990, Gorton Farms filed a complaint against American Cyanamid alleging theories of breach of warranty, defective product based on failure to provide adequate instructions for use, and negligent misrepresentation concerning SCEPTER's use in follow corn crops. In September, Gorton Farms amended its complaint to allege outrageous conduct in that American Cyanamid misrepresented SCEPTER as safe for "follow corn" despite having evidence of adverse carryover to corn from its field tests.

In November, 1991, American Cyanamid filed a "Motion For An Order Limiting Damages." American Cyanamid argued that: (1) SCEPTER's label contained enforceable disclaimers and limitations on liability; and (2) FIFRA expressly prohibits states from imposing additional or different labeling requirements and, therefore, preempts state common law tort claims

210

based on a failure to adequately warn. The circuit court ruled that the disclaimers did not limit American Cyanamid's liability and that FIFRA did not preempt Gorton Farms' state common law tort claims. The court stated: "It is this Court's opinion that the defendant has failed to demonstrate the clear purpose of Congress to have FIFRA supersede the police powers of the state of Wisconsin in this matter. Therefore, that portion of the defendant's motion to limit damages which is based on the doctrine of federal preemption is denied."

The case subsequently proceeded to a jury trial beginning in August, 1992. Following several weeks of trial, the jury was given a number of instructions as to negligence and strict liability. The jury found that American Cyanamid was "negligent regarding SCEPTER," that SCEPTER was not unreasonably dangerous to Gorton Farms' follow corn crops, that Gorton Farms was not negligent, and that American Cyanamid's conduct was outrageous. The jury awarded Gorton Farms compensatory damages in the sum of $129,300.00 and punitive damages in the sum of $50,000.00. Judgment on the verdict was entered on February 4, 1993. American Cyanamid filed a Notice of Appeal on March 22, 1993.

On March 4, 1993, Gorton Farms filed a motion in the circuit court requesting an award of attorney fees pursuant to sec. 100.18(11)(b)2, STATS. Following briefing and several oral hearings on the matter, the circuit court concluded that an award of attorney fees was appropriate and granted fees in the sum of $307,421.25. An amended judgment was entered on July 30, 1993. A Notice of Appeal from the amended judgment was filed on August 18, 1993. The court of appeals granted a motion by American Cyanamid to consolidate the two appeals. Following briefing to the

211

court of appeals, that court certified the above question to this court. We accepted jurisdiction of the entire matter on September 20, 1994. Further facts necessary for a resolution of the case are set forth below.

## I. Preemption under FIFRA

The threshold issue on review is whether the circuit court properly concluded that FIFRA does not preempt Gorton Farms' state common law tort claims. American Cyanamid asserts that all of Gorton Farms' claims are predicated on a theory of failure to warn and, as such, are preempted by sec. 136v(b) of FIFRA. Gorton Farms responds that "FIFRA does not preempt common law damage liability based on negligent and outrageous conduct and testing and in misrepresenting SCEPTER's safety to follow corn, which conduct was part of [American Cyanamid's] marketing and sales activity and not based on SCEPTER's labeling or packaging."[2]

---

[2] As an initial matter, we note that the record in this case does not contain a complete transcript of the trial evidence and proceedings. "When [an appellate] court does not receive a complete transcript, we assume that any fact necessary to sustain the trial judge's exercise of discretion is supported by the record." *Haack v. Haack,* 149 Wis. 2d 243, 247, 440 N.W.2d 794, 796 (1989) (citing *D.L. v. Huebner,* 110 Wis. 2d 581, 597, 329 N.W.2d 890, 897 (1983)); *see also Suburban State Bank v. Squires,* 145 Wis. 2d 445, 451, 427 N.W.2d 393, 396 (1988). Moreover, this court has explained that the scope of review is necessarily confined to the record before the court when an appeal is brought on a partial transcript. *Austin v. Ford Motor Co.,* 86 Wis. 2d 628, 641, 273 N.W.2d 233, 239 (1979). Even absent a complete transcript, however, this court can consider errors of law in circuit court memoranda.

Federal preemption of state law implicates issues of governmental authority that go to the very heart of our federal system. The potential for conflict between federal enactments and state law is a persistent reminder of the tensions inherent in our governmental structure. Although the federal Constitution envisions a substantial role for state governments, it also commands that federal law "shall be the supreme law of the land." U.S. CONST. art. VI, cl. 2.[3] Further, while states are treasured for their roles as "laborator[ies] . . . [to] try novel social and economic experiments," *see New York State Ice Co. v. Liebmann,* 285 U.S. 262, 311 (1932), there is also the recognition of the importance of national control and uniformity.

Recently, preemption principles have been the center of many hard-fought legal battles involving important societal issues. Examples of these disputes range from challenges as to the validity of state statutes designed to limit corporate takeovers, *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69 (1987), to challenges as to whether a state statute requiring payment of surcharges based on the status of the underlying insurance provider is preempted by ERISA, *New York Conference of Blue Cross Plans v. Travelers Ins. Co.,* 115 S. Ct. 1671 (1995). An interesting example of the controversy surrounding the use of federal pre-

---

[3] The complete text of the Supremacy Clause of the Constitution provides:

This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding.

U.S. CONST. art. VI, cl. 2

emption is an executive order promulgated by former President Ronald Reagan in 1987 designed to dissuade executive departments and agencies from interpreting federal statutes in ways that would displace state law.[4]

██

When considering the federal preemption doctrine an important benchmark is a definition of both federal and state law. Obviously, federal law includes the United States Constitution and all of the federal statutes and treaties promulgated by Congress. Federal law also includes federal regulations promulgated by

---

[4] *See* Exec. Order No. 12,612 (1987), reprinted in 5 U.S.C. sec. 601 app. 478 (1988). In pertinent part, the Order states:

(a) To the extent permitted by law, Executive departments and agencies shall construe, in regulations and otherwise, A Federal statute to preempt State law only when the statute contains an express preemption provision or there is some other firm and palpable evidence compelling the conclusion that the Congress intended preemption of State law, or when the exercise of State authority directly conflicts with the exercise of Federal authority under the Federal statute.

(b) Where a Federal statute does not preempt State law, Executive departments and agencies shall construe any authorization in the statute for the issuance of regulations as authorizing preemption of State law by rule-making only when the statute expressly authorizes issuance of preemptive regulations or there is some other firm and palpable evidence compelling the conclusion that the Congress intended to delegate to the department or agency the authority to issue regulations preempting State law.

(c) Any regulatory preemption of State law shall be restricted to the minimum level necessary to achieve the objectives of the statute pursuant to which the regulations are promulgated.

(d) As soon as an Executive department or agency foresees the possibility of a conflict between State law and Federally protected interests within its area of regulatory responsibility, the department or agency shall consult, to the extent practicable, with appropriate officials and organizations representing the States in an effort to avoid such a conflict.

214

the various federal agencies. In *Fidelity Federal Savings and Loan Assoc. v. De La Cuesta,* 458 U.S. 141, 153 (1982), the Supreme Court stated that "federal regulations have no less pre-emptive [sic] effect than federal statutes." Thus, federal law is broadly defined and includes regulations made by federal agencies under their congressionally granted authority.

On the state side, it is apparent that state constitutions, state statutes, and state regulations will all be encompassed within the definition of "state law." Also falling within the heading of state law, and of great importance to the issue at hand, is the concept of state common law tort actions. As noted by one commentator, "[t]he regulatory effect of tort law has long been recognized." Penning Parker Landen, *Federal Preemption and the Drug Industry: Can Courts Co-Regulate?,* 43 Food Drug Cosm. L.J. 85, 86 (1988). Further, In *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247 (1959), the Supreme Court stated that "[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing and controlling policy." Accordingly, the Court held that federal preemption of state action may occur where that action seeks "to redress private wrongs or grant compensation for past harm." *Id.*

Federal preemption may occur under several different scenarios. Express preemption occurs where Congress has seen fit to speak directly to the preemptive effect of a particular statute. The major question in cases arising under this scenario is the scope of the express preemption provision.[5] The more typical pre-

---

[5] A frequently cited case for this type of preemption is *Jones v. Rath Packing Co.,* 430 U.S. 519 (1977). In *Jones,* the Court

emption case involves a statute that is either silent, or at least ambiguous, with respect to its preemptive effect. Where a statute is silent or ambiguous, courts generally have required clear evidence of legislative intent to preempt state law. For example, in *Hillsborough County, Fla., v. Automated Medical La., Inc.,* 471 U.S. 707, 715 (1985), the Court noted that there is a basic "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Courts have, however, on occasion determined that a congressional enactment impliedly preempts state law. This implied preemption is most often separated into three categories: occupation of the field preemption, obstacle preemption, and administrative preemption. *See* Jose L. Fernandez, *Dynamic Statutory Interpretation: Occupational Safety and Health Act Preemption and State Environmental Regulation,* 22 FLA ST. U.L. REV. 75, 81–86 (1994).

---

considered a conflict between the California Business and Professions Code and the Federal Meat Inspection Act (FMIA) on measuring certain packaged meats. The state statute in question required that every package of bacon, at the time of the sale, weigh an amount equal to or greater than the weight stated on the package. The state law allowed for variations caused by the manufacturing process, but did not allow for deviations from stated weights due to moisture loss during distribution. FMIA, on the other hand, allowed for reasonable variations due to moisture loss. More importantly, the federal act contained a provision prohibiting the imposition of "[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under" FIMA. *Id.* at 530. The Court found this language to present a clear expression of legislative intent and concluded that the state law was preempted. *Id.* at 530–31.

Turning to the statute at hand, FIFRA was originally enacted in 1947 as a pesticide licensing and labeling statute and "was designed to work in harmony with the uniform state insecticide, fungicide and rodenticide act which was adopted in many States." S. REP. No. 838, 92nd Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 3993, 3999. In 1972, the Act was amended such that FIFRA was transformed from a labeling law into a comprehensive regulatory statute. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 991 (1984). As noted by the Supreme Court: "As amended, FIFRA regulated the use, as well as the sale and labeling, of pesticides; regulated pesticides produced and sold in both intrastate and interstate commerce; provided for review, cancellation, and suspension of registration; and gave EPA greater enforcement authority." *Id.* at 991–92.

Within FIFRA, Congress provided a detailed scheme for regulating the content of a pesticide's label. All pesticides sold in the United States must be registered for use by the EPA. 7 U.S.C. sec. 136a(a). The EPA has promulgated specific labeling requirements governing the scope, content, wording, and format of pesticide labeling. *See* 40 C.F.R. sec. 156 (1992). While the manufacturer designs and formulates the content of the label, it must file with the EPA a statement which includes "the name of the pesticide," "a complete copy of the labeling of the pesticide, a statement of all claims to be made for it, and any directions for its use;" and a full description of the tests made and the results thereof upon which the claims are based. 7 U.S.C. sec 136a(c)(1)(B)–(D).[6]

---

[6] There is no dispute that at all times pertinent to this suit, SCEPTER was registered and labeled pursuant to FIFRA's requirements.

217

FIFRA also contains a section relating to state's rights in relation to the statute. Section 136v of FIFRA, titled "Authority of States," provides:

(a) In General
A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this Act.

(b) Uniformity
Such State shall not impose or continue in effect any requirements for labelling or packaging in addition to or different from those required under this Act.

A plain reading of this provision reveals sec. 136v(a) expressly prohibits a state from permitting a sale or use of a pesticide that is prohibited by FIFRA, and sec. 136v(b) expressly prohibits any state labeling requirement "in addition to or different from" that imposed by FIFRA. However, in considering whether Congress intended to occupy the *entire* field of pesticide regulation through sec. 136v, we find no language to that effect, nor does the legislative history of the statute suggest it. *See Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 609–10 & n.4 (1991). As noted by the Supreme Court:

While the 1972 amendments turned FIFRA into a "comprehensive regulatory statute," the resulting scheme was not "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." To the contrary, the statute leaves ample room for States and localities to supplement federal efforts even absent the express regulatory authorization of sec. 136v(a) . . . . FIFRA

. . . leaves substantial portions of the field vacant
. . ..

*Id.* at 613 (citations omitted).

For more guidance on the preemption issue, both parties direct this court to *Cipollone v. Liggett Group, Inc.*, 112 S. Ct. 2608 (1992). *Cipollone* involved similar preemption provisions relating to the federal statutes governing cigarette labeling and advertising. *Id.* at 2616–17. The Court concluded that sec. 5(b) of the Public Health Cigarette Smoking Act of 1969 preempted the plaintiff's state law tort claims based on the defendant's failure to warn of the hazards of cigarette smoking. *Id.* at 2621.[7] The Court cautioned, however, that sec. 5 did not preempt all common law. For example, the Court stated that although the statute preempted state labeling requirements, it did not preempt state law obligations to avoid marketing a product with a manufacturing defect or with a design defect. *Id.* The Court then set forth its test to determine whether preemption was appropriate for plaintiff's common law claims:

[W]e must fairly but—in light of the strong presumption against pre-emption—narrowly construe the precise language of sec. 5(b) and we must look to each of petitioner's common law claims to determine whether it is in fact pre-empted. The central

---

[7] Section 5 of the 1969 Act, captioned "Preemption," provides:

No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

15 U.S.C. sec. 1334(b).

219

> inquiry in each case is straightforward: we ask whether the legal duty that is the predicate of the common law damages action constitutes a "requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion," giving that clause a fair but narrow reading.

*Id.* Thus, the teaching of *Cipollone* is that courts must compare the particular language of a statute's preemption provision with each common law claim asserted to determine whether the common law claim is in fact preempted. Further, only if "the legal duty that is the predicate of the common law damages action constitutes" a requirement for labeling or packaging that is in addition to or different from those required by FIFRA will the asserted claims be preempted.

In the present case, Gorton Farms brought claims based on defective product, breach of warranty, and negligent misrepresentation. There is no dispute that each claim is a viable action under Wisconsin state law. American Cyanamid, however, asserts that each of these claims is derivative to the labeling and packaging of SCEPTER and, therefore, should be preempted by FIFRA. Gorton Farms counters that its proof at trial never touched on or attacked SCEPTER's labeling or packaging; rather, it centered on American Cyanamid's field tests, lack of scientific testing, and false and misleading statements in the promotion of SCEPTER.

In its amended complaint, under the heading of "CLAIM II," Gorton Farms alleges the following:

> 13. SCEPTER as labeled for use in Wisconsin is a defective product since its application interferes with the normal crop rotation and causes a loss in crop yield.

14. American Cyanamid Company failed to adequately warn Gorton Farms of the dangerous nature of the product and provided defective instructions for use.

15. As a result of American Cyanamid Company's manufacture and sale of this defective product and its defective warnings and instructions in use Gorton Farms suffered pecuniary losses in its corn yield in 1988 and 1989.

These allegations provide two distinct claims: (1) strict liability—defective design or manufacture, and (2) strict liability—failure to warn.[8] In the special verdict,

---

[8] We note that those courts that have considered the issue have found the distinction in claims to be critical: (1) claims of strict liability based on design or manufacture defect are not preempted by FIFRA, *see Cipollone,* 112 S. Ct. at 2621 (noting that similar preemptive provision of Public Health Cigarette Smoking Act of 1969 does not preempt claims based on manufacturing defects); *Worm v. American Cyanamid Co.,* 5 F.3d 744, 747 (4th Cir. 1993) (claims relating to testing, manufacturing, and formulating are not preempted); *Helms v. Sporicidin International,* 871 F. Supp. 837, 843 (E.D. N.C. 1994) (claims based on defect in product are not preempted); *Higgins v. Monsanto,* 862 F. Supp. 751, 759 (N.D. N.Y. 1994) (claims of strict liability based on design defect survive FIFRA preemption); *Jillson v. Vermont Log Buildings, Inc.,* 857 F. Supp. 985, 991 (D. Mass. 1994) (claims regarding design and manufacture are not preempted by FIFRA); *Kennan v. Dow Chemical Co.,* 717 F. Supp. 799, 804–05 (M.D. Fla. 1989); *Fisher v. Chevron Chemical Co.,* 716 F. Supp. 1283, 1288 (W.D. Mo. 1989); whereas (2) claims of strict liability based on inadequate labeling are preempted by FIFRA, *see Shaw v. Dow Brands, Inc.,* 994 F.2d 364 (7th Cir. 1993) (strict liability claim based on failure to warn against combining regulated products preempted by FIFRA); *Worm v. American Cyanamid Co.,* 5 F.3d 744 (4th Cir. 1993) (strict liability claim that product unreasonably dangerous due to failure to provide inadequate labeling preempted by FIFRA); *King v. E.I.*

the jury was simply asked whether SCEPTER was unreasonably dangerous to Gorton Farms' follow corn crops. The jury answered the question "No." Gorton Farms did not cross-appeal from this finding, and, therefore, the issue of preemption of Gorton Farms' strict liability claim under FIFRA is not properly before this court.

In its amended complaint, Gorton Farms also alleges a breach of warranty claim. It appears, however, that this cause of action was abandoned at trial because the special verdict makes no reference to American Cyanamid's having breached a warranty, whether express or implied. Consequently, we do not consider whether a breach of warranty claim is preempted under FIFRA.

Gorton Farms' third and final cause of action asserts a claim for negligent misrepresentation:

> 17. American Cyanamid Company formulated or manufactured and sold its product known as SCEPTER and negligently held out and represented to Wisconsin Farmers that the product was a safe and effective means of controlling weeds in soybean crops . . . without harm to subsequent crops.

---

*Dupont De Nemours & Co.,* 996 F.2d 1346 (1st Cir. 1993) (strict liability claim alleging unreasonably and defectively dangerous product due to a failure to warn preempted by FIFRA); *Trinity Mountain Seed Co. v. MSD Agvet,* 844 F. Supp. 597 (D. Idaho 1994) (strict liability claim preempted by FIFRA because based on pesticide label language); *Kinser v. Ciba-Geigy Corp.,* 837 F. Supp. 217 (W.D. Ky. 1993) (strict liability claim alleging unreasonably dangerous product due to failure to warn preempted by FIFRA.)

18. As a result of such negligence, the use of this product by Gorton Farms, Gorton Farms suffered reduction in yield of corn in 1988 and 1989.

. . ..

19. The foregoing conduct of the defendant's agents or employees were willful and in reckless disregard of the plaintiffs' rights and such conduct proximately caused the plaintiffs' actual damages.

The elements of a claim for negligent misrepresentation in Wisconsin are: (1) a duty of care or voluntary assumption of a duty on the part of the defendant; (2) a breach of that duty, i.e., failure to exercise ordinary care in making the representation or in ascertaining the facts; (3) a causal link between the conduct and the injury; and (4) actual loss or damage as a result of the injury. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 319, 401 N.W.2d 816, 822 (1987).

In *Cipollone,* the petitioner alleged two theories of misrepresentation. First, petitioner argued that the respondents, through its advertising, "neutralized the effect of federally mandated warning labels." *Cipollone,* 112 S. Ct. at 2623. The Court noted that this claim was predicated on a state-law prohibition against statements downplaying the effects of smoking. *Id.* The Court concluded that because this claim "is merely the converse of a state law requirement that warnings be included in advertising and promotional materials," it is prohibited by sec. 5(b) of the 1969 Act which preempts both requirements and prohibitions. *Id.* Second, petitioner alleged fraud and misrepresentation both by " 'false representation of a material fact [and by] conceal[ment of] a material fact.' " *Id.* (citing trial transcript). The Court noted that the state law duty of such a claim—not making false statements of material fact or concealing such facts—was not the sort of

requirement or prohibition proscribed by sec. 5(b). *Id.*
The Court explained:

> State law prohibitions on false statements of mate-
> rial fact do not create "diverse, nonuniform, and
> confusing" standards. Unlike state law obligations
> concerning the warning necessary to render a prod-
> uct "reasonably safe," state law proscriptions on
> intentional fraud rely only on a single, uniform
> standard: falsity. Thus, we conclude that the phrase
> "based on smoking and health" fairly but narrowly
> construed does not encompass the more general
> duty not to make fraudulent statements. Accord-
> ingly, petitioner's claim based on allegedly
> fraudulent statements made in respondents' adver-
> tisements are not pre-empted by sec. 5(b) of the
> 1969 Act.

*Id.* at 2624.

We follow the *Cipollone* reasoning on this point
and hold that Gorton Farms' claim based on misrepre-
sentation survives preemption under FIFRA.[9] We see
nothing in FIFRA that seeks to overturn the longstand-
ing rules governing misrepresentation. On the
contrary, FIFRA simply seeks uniformity in labeling
and packaging and mandates that states shall not

[9] We note that the *Cipollone* decision in regard to the por-
tion concerning a claim for misrepresentation was part of the
plurality joined by Chief Justice Rehnquist and Justices White,
Stevens, and O'Connor. *Cipollone,* 112 S. Ct. at 2623–24. How-
ever, Justice Blackmun, with whom Justices Kennedy and
Souter joined, agreed with that part of the judgment determin-
ing that one of plaintiff's misrepresentation claims was not
preempted under FIFRA. *Id.* at 2629–31. Thus, seven justices
reached the ultimate conclusion that one of plaintiff's state law
misrepresentation claims was not preempted by federal law.

impose labeling or packaging requirements other than those prescribed by the statute itself. Further, our reading of sec. 136v(b) leads us to conclude that its preemptive effect does not encompass the general duty not to make false statements. Quite simply, claims based on misrepresentations of fact do not challenge the labeling of a manufacturer's product.

Here, Gorton Farms presented evidence that American Cyanamid made representations that SCEPTER was safe to follow corn. These representations were made through written product such as promotional materials, advertisements, technical reports, as well as through oral statements made by American Cyanamid's technical service representatives. All of the statements assuring that SCEPTER was "safe" and "extremely safe" had no relation to the labeling or packaging of the herbicide. Gorton Farms also presented evidence that American Cyanamid internal documents unequivocally showed that SCEPTER caused damage to follow corn crops in a variety of circumstances and yet, the company failed to disclose any information other than assertions that SCEPTER was safe to follow corn. As noted by Gorton Farms in its brief to this court: "Having heard rumors of SCEPTER carry over to follow corn in the fall of 1987, John Gorton asked an [American Cyanamid] technical service representative about it in February 1988, and [American Cyanamid's] representative assured him it was safe to plant corn following soybeans treated with SCEPTER. Thereafter, Gorton Farms again purchased SCEPTER for use in 1988."

We conclude that not only does the Gorton Farms' misrepresentation claim survive preemption under FIFRA, the evidence adduced at trial was credible and

225

sufficient to sustain the jury's finding that American Cyanamid made negligent misrepresentations of facts as to the safety of SCEPTER and that this conduct was outrageous. As this court previously has noted, the proper test to be applied in determining whether a jury's answer should be sustained is whether there is any credible evidence to support the jury's answer. *Giese v. Montgomery Ward, Inc.,* 111 Wis. 2d 392, 408, 331 N.W.2d 585, 593 (1983); *D'Huyvetter v. A.O. Smith Harvestore Products,* 164 Wis. 2d 306, 320, 475 N.W.2d 587, 592 (Ct. App. 1991). "There is credible evidence which, when reasonably viewed, fairly admits an inference supporting the jury's findings. That being true, neither the trial court nor this court has authority to change the jury's findings." *Giese,* 111 Wis. 2d at 408, 331 N.W.2d at 593. Where, as here, the jury verdict has the approval of the circuit court, the scope of review is even more limited. *See Fehring v. Republic Ins. Co,* 118 Wis. 2d 299, 305, 347 N.W.2d 595, 598 (1984). Our review of the evidence adduced at trial leads us to conclude that there is credible evidence to support the jury's findings. Gorton Farms presented evidence that: American Cyanamid voluntarily assumed a duty; breached that duty by failing to exercise ordinary care in making the representations concerning SCEPTER; that the injury was caused by the conduct of American Cyanamid; and, that Gorton Farms sustained actual loss and damage as a result of the injury to its follow corn crops.[10]

[10] In its brief to both the court of appeals and the supreme court, American Cyanamid presents an argument that even granting that FIFRA does not preempt all of Gorton Farms' claims, "[t]he economic loss doctrine precludes the respondents from recovering damages based upon their tort claims." This issue was not raised before the circuit court either at trial or in a

## II. Attorney Fees

Following trial, counsel for Gorton Farms filed a petition requesting an award of attorney fees pursuant to sec. 100.18, STATS.—"Fraudulent representations." In short, sec. 100.18 provides that no person or corporation may advertise, announce or make a statement that "contains any assertion, representation or statement of fact which is untrue, deceptive or misleading." As relevant here, Gorton Farms sought attorney fees under sec. 100.18(11)(b)2, STATS., which states: "Any person suffering pecuniary loss because of a violation of this section by any other person may sue in any court of competent jurisdiction and shall recover such pecuniary loss, together with costs, including reasonable attorney fees."

The facts surrounding the issue of attorney fees are not in dispute. Gorton Farms filed their original complaint on February 8, 1990. They subsequently amended their complaint twice prior to trial. These documents did not contain an allegation that American Cyanamid had violated sec. 100.18, STATS. During trial, counsel did not present a specific allegation concerning a violation of sec. 100.18. Further, no jury instruction was requested concerning this statutory cause of action.

Following the jury verdict, on February 3, 1994, Gorton Farms moved for judgment on the verdict pursuant to sec. 805.14(5), STATS. On March 4, 1993,

---

motion after verdict. The court of appeals in its certification memorandum did not consider the issue. We conclude that because American Cyanamid failed to properly raise the issue at the circuit court level, it has waived the right for consideration of the issue by this court. *See Allen v. Allen,* 78 Wis. 2d 263, 270–71, 254 N.W.2d 244, 248 (1977) (supreme court generally does not review an issue raised for the first time on appeal).

counsel for Gorton Farms filed a document titled "Petition For Hearing Regarding Attorney Fees." The document asserted that "[i]n the course of discovery and during the trial of the case, evidence was obtained by the plaintiffs which showed that the defendant violated Section 100.18 of the Wisconsin Statutes and that plaintiffs were damaged by reason of the defendant's violation of that section." Counsel then requested that Gorton Farms be allowed to amend their pleadings to assert a claim that American Cyanamid violated sec. 100.18. Counsel, citing *John v. John,* 153 Wis. 2d 343, 450 N.W.2d 795 (Ct. App. 1989), *cert. denied,* 498 U.S. 814 (1990), asserted in the alternative that the pleadings would not necessarily have to be amended because a prayer for relief is not a substantive part of the complaint.[11]

The parties filed briefs on the matter and hearings before the circuit court were held on June 7, 1993, and July 29, 1993. The court granted the petition and signed an "Order Granting Attorney Fees and for Amendment of Judgment" which states in relevant part: "After hearing the parties, the Court stated its decisions and the reasons for its decisions orally on the record wherein it found that the plaintiffs were damaged by reason of defendant's untrue, deceptive or misleading statements within the meaning of Section 100.18 Wis. Stats."

On appeal, American Cyanamid presents two arguments relating to this issue:

---

[11] In *John,* the court of appeals determined that an amendment of the pleadings in the case was unnecessary because "[t]he only post-trial change consisted of an additional form of relief," and "[a] prayer for relief is not a substantive part of the complaint." *John,* 153 Wis. 2d at 367, 450 N.W.2d at 806.

1. "The trial court lacked competence to rule on a petition for attorney fees pursuant to sec. 100.18(11)(b)2, STATS. filed more than six months after the verdict was rendered," and;

2. "The trial court erred in failing to apply sec. 802.09(2), STATS. to plaintiffs petition for attorney fees."[12]

Both of these issues are framed in a manner that suggests an attack on the procedural aspects of the case rather than the substantive concern of whether attorney fees are appropriate under the present circumstances. The second issue, however, does entail, to some extent, a consideration of the substantive concerns. We will address each issue in turn.

American Cyanamid first asserts that the trial court lacked competence because Gorton Farms did not follow proper rules of civil procedure pursuant to sec. 805.16, STATS. Section 805.16(1), STATS. , provides that "[m]otions after verdict shall be filed and served within 20 days after the verdict is rendered, unless the court, within 20 days after the verdict is rendered, sets a longer time by order specifying the dates for filing motions, briefs or other documents." Further, sec. 805.16(3), STATS., states that "[i]f within 90 days after the verdict is rendered the court does not decide a motion after verdict on the record . . . the motion is considered denied and judgment shall be entered on the verdict."

Here, there is no dispute that more than 20 days elapsed before counsel filed the request for attorney

---

[12] As an initial matter, we note that American Cyanamid did not take issue on appeal with the reasonableness of the attorney fees as awarded by the circuit court. Thus, we pass no judgment as to the reasonableness of the amount awarded.

fees. Further, the circuit court ruling awarding attorney fees was entered more than 90 days after the entry of the verdict. These facts, however do not mandate the conclusion that the circuit court was without authority to act in awarding attorney fees.

■

First, sec. 805.16 contemplates trial-related motions—new trial, evidentiary considerations, etc. A petition for attorney fees, on the other hand, is not trial-related; rather, it is verdict-related as it is predicated on a party's prevailing party status. Second, case law indicates that an award of attorney fees may be considered after entry of a judgment or order. For instance, in *ACLU v. Thompson,* 155 Wis. 2d 442, 446, 455 N.W.2d 268, 270 (Ct. App. 1990), the court concluded that a trial court could postpone an award of attorney fees in a civil rights action brought under 42 U.S.C. sec. 1983 without depriving its order or judgment on the merits of finality and appealability. The court reached this conclusion by noting that making an award prior to a final judgment being entered is unnecessary because the fee determination is separate from the underlying action. *Id.* at 446, 455 N.W.2d at 270. Further, in *Richland School Dist. v. DILHR,* 166 Wis. 2d 262, 285–86, 479 N.W.2d 579, 589 (Ct. App. 1991), *aff'd* 174 Wis. 2d 878, 498 N.W.2d 826 (1993), the court held that the time limit on the request for statutory attorney fees to the trial court "is a reasonable time after the court enters a final order or judgment on the merits favorable to the requester. Only then will the requester know that the litigation has terminated and that the requester has prevailed." In *Richland School Dist.,* the request for attorney fees came 41 days after the trial court rendered its decision. *Id.* at 287 n.7, 479 N.W.2d at 590 n.7.

American Cyanamid next argues that the circuit court misapplied sec. 802.09(2), STATS., to the facts at hand. Section 802.09(2), STATS., provides:

AMENDMENTS TO CONFORM TO THE EVIDENCE. If issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice such party in maintaining the action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

American Cyanamid posits that Gorton Farms' request for attorney fees under sec. 100.18, STATS., was never tried by either express or implied consent and, therefore, the pleadings should not have been amended to include this claim. Gorton Farms counters that an amendment under sec. 802.09(2) was unnecessary because a claim for attorney fees was not part of the merits of the action to which fees pertain. Gorton Farms asserts in the alternative that even assuming an amendment of the pleadings was necessary, the circuit court acted within its discretion in amending the pleadings because an amendment was necessary to conform them to the evidence presented at trial.

231

American Cyanamid's protests notwithstanding, this case clearly deals with allegations that American Cyanamid engaged in false and misleading advertising resulting in pecuniary loss to the plaintiffs. These are exactly the type of allegations that fall within the purview of sec. 100.18(1), STATS. *See Grube v. Daun,* 173 Wis. 2d 30, 57, 496 N.W.2d 106, 116 (Ct. App. 1992) (noting that "Wisconsin Supreme Court and this court have made clear that the statute intends to protect the public from all untrue, deceptive or misleading representations made in sales promotions, including representations made in face-to-face sales where no media advertising is involved."). Gorton Farms' negligent misrepresentation claim, as presented by the evidence at trial, entailed all of the elements of a claim brought pursuant to sec. 100.18(1), STATS. Thus, the jury, as well as the circuit court judge, heard all of the evidence that it needed to render a decision regarding the sec. 100.18 claim. The jury returned a verdict that American Cyanamid was negligent and that its conduct was outrageous.

We conclude that the circuit court properly exercised its discretion in determining that sec. 802.09(2), STATS., would allow Gorton Farms' post-trial request for attorney fees. American Cyanamid had ample opportunity to rebut the underlying allegations stemming from a sec. 100.18, STATS., claim, and in fact, presented substantial evidence at trial in an effort to rebut Gorton Farms' assertions on this point. As noted by the circuit court: "[T]he plaintiffs did in fact suffer pecuniary losses because of a violation of this section [sec. 100.18] and accordingly should be permitted reasonable attorney fees." Quite simply, it is disingenuous for American Cyanamid to presently assert that it had

232

no idea that its statements relating to the sale of SCEPTER were to be at issue during trial.

In sum, although there is an argument that Gorton Farms should have pleaded a sec. 100.18, STATS., claim prior to or during trial, there is no dispute that the claim was fully aired at trial. Further, in asserting a claim for attorney fees post-trial, American Cyanamid was in no way prejudiced. *See State v. Peterson,* 104 Wis. 2d 616, 312 N.W.2d 784 (1981); *Zobel v. Fenendael,* 127 Wis. 2d 382, 379 N.W.2d 887 (Ct. App. 1985). There simply was no other evidence that could have been presented during trial to rebut a sec. 100.18 claim vis a vis the claims that were already at issue based on the original and amended complaints.

*By the Court.*—Order of the circuit court is affirmed.